**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Eagle,<br><br>                    Plaintiff,<br><br>          v.<br><br>Bill Alexander Automotive Center, Inc.,<br><br>                    Defendant. | No. CV 11-01148-PHX-JAT<br><br>**ORDER** |

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. 64) and Defendant's Motion to Strike Plaintiff's Statement of Facts (Doc. 81). Defendant has filed a statement of facts supporting the motion for summary judgment (Doc. 65). Plaintiff, James Eagle, has filed a response in opposition to Defendant's motion for summary judgment (Doc. 75) and a statement of facts in opposition to Defendant's motion for summary judgment (Doc. 74). Defendant has also filed a reply in support of the motion for summary judgment and a motion to strike Plaintiff's statement of facts (Doc. 81). The parties appeared before the Court for oral argument on this matter on September 11, 2013.

Plaintiff has filed a response in opposition to Defendant's motion to strike (Doc. 91) and Defendant has filed a reply in support of the motion to strike (Doc. 95). The parties appeared before the Court for oral argument on the pending motions on Wednesday, September 11, 2013. The Court now denies Defendant's motion to strike and grants Defendant's motion for summary judgment for the following reasons.

**I.     Defendant's Motion to Strike (Doc. 81)**

As an initial matter, Defendant has filed a motion to strike certain statements of fact in Plaintiff's statement of facts.  (Doc. 81).  Defendant requests that the Court strike any factual statements premised on paragraphs 5 and 6 of Exhibit B (Doc. 74-1 at 42) to Plaintiff's statement of facts because Exhibit B contains only conclusions and does not cite actual facts (Doc. 81 at 1-3); that the Court strike Exhibit F to Plaintiff's statement of facts (Doc. 74-1 at 51-62) and all factual contentions which rely on Exhibit F because Exhibit F has not been authenticated (Doc. 81 at 4); that the Court strike immaterial facts (*id.* at 5); and that the Court strike Plaintiff's contradicting facts not supported by the record (*id.*).

However, the Court should consider evidence subject to potential hearsay objections because it is inappropriate to focus on the admissibility of the evidence's form at the summary judgment stage.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  The focus at the summary judgment stage in the proceeding is the admissibility of its contents.  *Id.*; *see also Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."); *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.") (quotation marks and citation omitted).

Accordingly, the Court will deny Defendant's motion to strike and consider any material facts presented by Plaintiff consistent with this standard.  As the Court explains below, some of the contradicting facts offered by Plaintiff are indeed conclusory statements without evidentiary support.  The Court will consider these statements of fact on a case by case basis.

## II.   BACKGROUND

Plaintiff claims Defendant discriminated against him because of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §

621, *et seq*.  Plaintiff was born on August 12, 1944.  (Doc. 65 at 9).  Plaintiff was hired by Bill Alexander Automotive Center (the "Dealership") in Yuma, Arizona, in July 2002.  (*Id*.).  After being hired, Plaintiff created the position of "Preferred Finance Director" and "Leasing Manager" for himself with the Dealership's approval.  (*Id*.).  It was rare for an auto dealership to have a Preferred Finance Director position.  (*Id*. at 11).  As the Preferred Finance Director/Leasing Manager, Plaintiff's primary duty was to close lease deals.  (*Id*. at 10).  While the Dealership had the capacity to close lease deals prior to hiring Plaintiff, the Dealership did not have a designated employee acting as a Preferred Finance Director/Leasing Manager until Plaintiff began working there.  (*Id*. at 9).  The titles Preferred Finance Director and Leasing Manager were interchangeable at the Dealership while Plaintiff filled this position.  (*Id*.).  In addition to closing lease deals, Plaintiff's other duties included oversight of the Dealership's advertising, sales force training, and assisting the General Sales Manager in conducting sales meetings at the Dealership.  (*Id*.).  Plaintiff never directly supervised anyone while working at the Dealership and he never worked in the service department.  (Doc. 75 at 9).

Bill Alexander was the owner of the Dealership and the General Manager of record ("GM") when Plaintiff was hired and until Alexander's death in October 2008.  (Doc. 65 at 2, 7).  Alexander's grandson, Ryan Hancock, was the acting General Manager from 2002 through 2008.  (*Id*. at 5).  Hancock hired Plaintiff in 2002.  (*Id*. at 9).  In 2004, Hancock hired T.R. Snow as the "Fleet Manager."  (Doc. 75 at 3).  Hancock promoted Snow to General Sales Manager in 2007.  (*Id*.).  As General Sales Manager, Snow was Plaintiff's supervisor.  As a result, Plaintiff reported to Snow, Hancock, and Alexander in 2007 and 2008.  (*Id*.).

The Dealership is an authorized Toyota dealership, authorized by Toyota Motor Sales U.S.A., Inc. ("Toyota").  (*Id*. at 2).  Toyota measures customer satisfaction with the purchase of Toyota products and services from authorized Toyota dealerships.  (*Id*.).  This customer satisfaction is tracked by Customer Service Index ("CSI") scores at authorized Toyota dealerships throughout the country.  (*Id*.).  Positive CSI scores are

important to Toyota.  (*Id*. at 3).

From 2004 through 2008, the Dealership was in the bottom 10% of CSI scores for sales in its region (that encompassed six states) and in the nation.  (*Id*.).  The Dealership was also in the bottom 10% of CSI scores for service in its region and in the nation from 2005 through 2010.  (*Id*. at 4).

Toyota requires that the GM of record at the Dealership meet distinct qualifications.  (*Id*. at 5).  The GM of record is hired by the Dealership's owner but must be approved by Toyota.  (*Id*.).  Toyota requires that the approved GM has full day-to-day operational authority over the dealership they operate, including the final authority to make personnel decisions.  (*Id*. at 4, 8).

In December 2007, Toyota declined to approve Hancock as the GM of record for the Dealership because of the Dealership's consistently low CSI scores.  (*Id*. at 4).  On December 21, 2007, Toyota executives informed Alexander and Hancock that Alexander would remain the GM of record for the Dealership.  (*Id*. at 6).  On January 9, 2008, Toyota informed Alexander that should he ever be unable to perform the duties of GM that Toyota could force the appointment of an individual with proven, successful, and relevant experience to assume the GM position.  (*Id*.).  In January 2009, Hancock was also required by Toyota to sign an "Investor Only" letter and return it to Toyota confirming that he would not serve as the GM for the Dealership and specifically that he would not run the Dealership on a day-to-day basis.  (*Id*. at 7).

Alexander died in October 2008.  (*Id*.).  Upon Alexander's passing, Toyota immediately sent a letter to Hancock informing him that he was not eligible to serve as the GM for the Dealership and that he had 60 days to notify Toyota of a candidate for GM.  (*Id*.).  Toyota further informed Hancock that the candidate for GM would need to be evaluated by Toyota and approved.  (*Id*.).

While working at the Dealership, Plaintiff functioned as one of the Dealership's "closers," which was someone salespeople would bring difficult customers to in order to close the deal.  (Doc. 75 at 2).  Throughout 2008 and through the beginning of 2009,

Plaintiff was the highest grossing salesman at the Dealership in twelve out of thirteen months.  (Doc. 74-1 at 51-62).  During that time the Dealership employed between three and ten salespeople.  (*Id*.).  The majority of salespeople that Plaintiff worked with were under 40 years old, including: Dennis Loper, Dave Lehman, and Luis Arias.  (Doc. 75 at 7).

At some point during Plaintiff's employment at the Dealership, employees began making disparaging comments to Plaintiff.  In an October 2008 sales meeting, attended by members of the Dealership's sales team, Hancock made the statement, "These are my guys.  You, Dave [Lehman] you're young.  These are my guys.  This is my team.  This is what I want, all young guys around me.  Sorry Eagle."  (Doc. 75 at 4).  Hancock also made other discriminatory comments to Plaintiff on unidentified dates; Hancock called Plaintiff an "old f**k" and said "He's too old," "I like young guys," "You're just old, Eagle," and "Eagle is too old."  (*Id*.).  On unidentified dates, unidentified employees at the Dealership also called Plaintiff "old f**k," "grandpa," "old motherf***er," "dinosaur," and suggested Plaintiff was getting Alzheimer's disease.  (*Id*.).

In January 2009, Hancock hired Robert Santa Maria to be the GM of the Dealership.  (Doc. 65 at 8).  Toyota met with Santa Maria and approved him to be the GM of record.  (*Id*.).  Hancock and Toyota told Santa Maria that he was hired to improve the CSI scores of the Dealership and that Santa Maria would have complete authority over the day-to-day operations of the Dealership, including all personnel decisions.  (*Id*.).  Toyota stressed to Santa Maria that he was in charge of the Dealership and that Hancock was only the Investor.  (*Id*.).  Toyota also told Santa Maria that his number one priority was to increase the Dealership's CSI scores.  (*Id*. at 11).  The Dealership agreement for the Dealership specifically stated that Santa Maria was the Dealership's designated GM and had full operational authority.  (*Id*. at 10).  Santa Maria began work as the GM on January 28, 2009.  (*Id*. at 9).  As the GM, Santa Maria was Plaintiff's supervisor.  (*Id*. at 11).

Santa Maria became acquainted with Plaintiff during his initial weeks working as

the GM.  (*Id*. at 11).  Prior to starting at the Dealership, Santa Maria had never heard of a Preferred Finance Director position at any other dealerships.  (*Id*.).  Santa Maria evaluated Plaintiff's compensation and felt that Plaintiff was overcompensated for the services he provided for the Dealership.  (*Id*.).

Santa Maria determined that to improve CSI scores, he needed to change the culture and some key personnel at the Dealership in order to put the focus on customers and employees.  (*Id*. at 10).  A week after starting work as the GM, Santa Maria began making personnel changes.  (*Id*. at 15).  Santa Maria terminated the employment of the Parts Manager, William Rivera on February 4, 2009.  (*Id*.).  Rivera was 28 years old when he was fired.  (*Id*.).

Santa Maria also found that the General Sales Manager Snow and Plaintiff had an impact on the sales department.  (*Id*. at 10).  Plaintiff and Snow conducted training for the sales personnel, Plaintiff was almost exclusively handling lease deals and he was in charge of advertising.  (*Id*.).  In addition, due to the financial crisis throughout the country in 2008 and 2009, the number of banks willing to finance car purchases and leases began to decline and leasing at the Dealership also declined.  (*Id*. at 12).  Santa Maria concluded that the Dealership did not need a dedicated "Preferred Financial Director" with the sole function of writing leases because other employees at the Dealership were capable of writing leases as well.  (*Id*.).  On March 2, 2009, Santa Maria terminated the employment of Plaintiff and Snow.  (*Id*. at 13).  Snow was 33 years old when he was fired.  (*Id*. at 14).  In April and October 2009 respectively, Santa Maria terminated the employment of Service Advisor Jose Raymundo and Service Porter Andres Garcia.  (*Id*. at 15).  Raymundo was 28 years old and Garcia was 22 years old when each was fired respectively.  (*Id*.).  After Snow and Plaintiff were terminated, employees at the Dealership expressed their happiness that Snow and Plaintiff were gone because both parties allegedly contributed to a high-pressure sales environment and were intimidating.  (*Id*.).

By the end of 2009, the Dealership's CSI scores for sales had risen and were out

of the bottom 10% in the region and in the nation.  (*Id.*).  The Dealership's CSI scores continued to improve in 2010 and 2011.  (*Id.* at 16).  By the end of 2010, the Dealership's CSI scores for service had also improved and rose out of the bottom 10% in the region and nation.  (*Id.*).

In 2012, the Dealership was awarded the prestigious President's Award from Toyota because of the Dealership's improved CSI scores.  (*Id.*).  The President's Award is awarded by Toyota to outstanding dealerships each year that excel in all facets of their operations.  (*Id.*).  Santa Maria accepted the award on behalf of the Dealership in 2012.  (*Id.*).

After being terminated, Plaintiff filed a discrimination charge against the Dealership with the Equal Employment Opportunity Commission ("EEOC").  (Doc. 74 at 23).  In his first response to the EEOC on behalf of the Dealership, in August 2009, Santa Maria stated that he terminated Plaintiff because Santa Maria had decided to eliminate the "Preferred Finance Department."  (*Id.*).  In another response to the EEOC in October 2009, Santa Maria explained that Plaintiff was terminated because Santa Maria had eliminated the position of Leasing Director.  (*Id.*).

Plaintiff filed a Complaint in this Court on June 7, 2011, alleging a claim of age discrimination against Defendant.  (Doc. 1).  Following discovery, Defendant filed the pending motion for summary judgment.  (Doc. 81).

## III.   DISCUSSION

In the Complaint, Plaintiff alleges Defendant discriminated against him because of his age in violation of the ADEA.  (Doc. 1 at 1).  In the motion for summary judgment, Defendant argues that there is no genuine dispute over the fact that Plaintiff was terminated by the GM Santa Maria for legitimate reasons that had nothing to do with Plaintiff's age.  (Doc. 64 at 1).  Therefore, Defendant contends that it is entitled to summary judgment under Federal Rule of Civil Procedure 56.  (*Id.* at 3).

### A.   Summary Judgment

Summary judgment is only appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id*. 56(c)(1)(A)&(B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). In the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Id*. at 248. A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id*.

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient

evidence favoring the non-moving party for a jury to return a verdict for that party.  *Id.* at 249-250.  If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment.  *Id.*

### B.      Age Discrimination Under the ADEA

The ADEA makes it "unlawful for an employer . . . to discharge any individual [who is at least 40 years of age] . . . because of such individual's age."  29 U.S.C. §§ 623(a), 631(a).  "We evaluate ADEA claims that are based on circumstantial evidence of discrimination by using the three-stage burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  "To establish a violation of ADEA under the disparate treatment theory of liability, [Plaintiff] 'must first establish a prima facie case of discrimination.  If [he does], the burden then shifts to [Defendant] to articulate a legitimate nondiscriminatory reason for its employment decision.  Then, in order to prevail, [Plaintiff] must demonstrate that [Defendant's] alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.'"  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).  "Despite the burden shifting, the ultimate burden of proof remains always on the former employee[ ] to show that [Defendant] intentionally discriminated because of [his] age."  *Id.* at 1281.

A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment.  This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record."  *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotation omitted); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) ("In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the

evidence and an opportunity to evaluate the credibility of the witnesses."). Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (citing *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027-28 (9th Cir. 2006)).

### 1.    Plaintiff's Prima Facie Case

To establish a prima facie case of age discrimination by circumstantial evidence, Plaintiff must "demonstrat[e] that he was (1) at least forty years old, (2) performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz*, 521 F.3d at 1207 (quoting *Coleman*, 232 F.3d at 1281).

"The requisite degree of proof necessary to establish a prima facie case for Title VII and ADEA claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987), cert. denied, 498 U.S. 939 (1990)); *see also Sischo–Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991) ("The amount [of evidence] that must be produced in order to create a prima facie case is very little."). Plaintiff need only offer evidence which "gives rise to an inference of unlawful discrimination." *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (1986) (quotation omitted). "The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas*, or by more direct evidence of discriminatory intent. In offering a prima facie case, of course, a plaintiff may present evidence going far beyond the minimum requirements." *Wallis*, 26 F.3d at 889 (citations omitted). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

The Court finds Plaintiff has established a prima facie case of age discrimination in this case.  Plaintiff has met the first factor because the undisputed facts show that Plaintiff is a member of the protected class because he was born on August 12, 1944.

To establish the second factor, that he was performing his job satisfactorily, Plaintiff offers essentially one undisputed material fact as proof.  Between February 2008 and January 2009 (twelve of the thirteen months leading up to Plaintiff's termination), Plaintiff was the top grossing sales manager out of three to ten sales managers every month except for one (April 2008) in which Plaintiff was the second highest grossing sales manager.  While satisfactory job performance is a broad term that can be judged by myriad factors, the Court finds that because Plaintiff's job was essentially to sell cars, this fact alone is enough to establish a prima facie case that Plaintiff performing his job satisfactorily.  Accordingly, Plaintiff has met his initial burden for this factor.

Plaintiff has met the third factor because the undisputed facts show that Plaintiff was discharged by Santa Maria on March 2, 2009.

Finally, with regard to the fourth factor, Plaintiff asserts in his Complaint that he was "replaced [ ] with a less qualified, younger employee" (Doc. 1 at 4), and Plaintiff's EEOC charge also asserts that "[o]lder employees have been replaced with younger people" (Doc. 1-1 at 2).  Yet, Plaintiff admits that he was not actually replaced by a younger employee, he contends that Defendant merely retained younger, less qualified employees.  (Doc. 75 at 10-11).  Defendant argues that Plaintiff's theories of liability are limited to theories he asserted in his Complaint and because Plaintiff only claimed he was replaced by a younger employee, Plaintiff cannot pursue his claim now while admitting he was not replaced.  (Doc. 64 at 6) (citing *Coleman*, 232 F.3d at 1292).

The fourth factor in establishing a prima facie case is showing that an employer "either" replaced the terminated employee with substantially younger employees with equal or inferior qualifications "*or* discharged the employee under circumstances otherwise giving rise to an inference of age discrimination."  *Diaz*, 521 F.3d at 1207 (emphasis added).  Defendant's argument is premised on the argument that the "or" in

this factor stipulates two distinct theories of liability and Plaintiff only alleged the first theory in both his Complaint and in his EEOC charge—that he was replaced.  Defendant bases this argument on *Coleman*. (Doc. 64 at 6).

The Ninth Circuit Court of Appeals found in *Coleman* that where a plaintiff sets forth one theory in the complaint and does not move to amend until summary judgment proceedings, it is barred from proceeding on a new theory.  *Coleman*, 232 F.3d at 1292. In *Coleman*, employees suing under the ADEA changed their theory from disparate treatment (which they had alleged in the complaint and relied on throughout discovery) to disparate impact (which had never been raised before the summary judgment stage). Though both disparate treatment and disparate impact are theories that are found in the ADEA, the district court refused to allow the employees to rely on the new theory at the summary judgment stage, reasoning that the employer was prejudiced by the lack of disclosure regarding this theory.  The Court of Appeals affirmed, explaining that "[a]fter having focused on intentional discrimination in their complaint and during discovery, the employees cannot turn around and surprise the company at the summary judgment stage on the theory that an allegation of disparate treatment on the complaint is sufficient to encompass a disparate impact theory of liability."  *Id*. at 1292-93.

Unlike *Coleman*, however, throughout this case Plaintiff has solely alleged a claim under a theory of disparate treatment.  Defendant's interpretation of *Coleman* is also overly broad.  As another Court in the Ninth Circuit has explained,

> *Coleman* does not stand for the proposition that a plaintiff can only proceed on those theories of liability raised in [his] complaint.  In fact, in *Coleman* the Ninth Circuit was presented with the opportunity to adopt such a hard-and-fast rule to that effect, yet declined to do so.  Instead, the Ninth Circuit held that even if a plaintiff failed to plead an additional theory in [his] complaint, [he] could nonetheless pursue that theory if [he] made it known during discovery of [his] intention to pursue recovery under that theory.

*Gartner, Inc. v. Parikh*, CV 07-2039-PSG, 2008 WL 4601025, at \*6 (C.D. Cal. Oct. 14, 2008) (citing *Coleman*, 232 F.3d at 1294).

In *Wallis v. J.R. Simplot Co.*, the Court of Appeals noted an even narrower fourth factor and said all a plaintiff must prove to establish the fourth factor was that he was "replaced by a substantially younger employee with equal or inferior qualifications." Even when replacement was the only theory considered to establish a *prima facie* case the Court of Appeals went on to explain that,

> Proof of the replacement element is not always required, however. Where the discharge results from a reduction in work force, the plaintiff may show "through circumstantial, statistical or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." [*Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990).] Such an inference can be established by showing the employer had a "continuing need for his skills and services in that his various duties were still being performed." *Id.*

*Wallis*, 26 F.3d at 891. "The test for the prima facie case changes somewhat [ ] where a discharge occurs in the context of a general reduction in the employer's workforce. In this context, circumstantial evidence other than evidence concerning the identity of a replacement employee may also warrant an inference of discrimination. The reason for this difference is that in most reduction-in-force cases no replacements will have been hired." *Diaz*, 521 F.3d at 1208 n. 2.

In this case, Plaintiff offers no evidence that he was replaced by a younger employee. The evidence that Plaintiff does offer to establish the fourth factor and show an inference of age discrimination are: 1) comments made by Hancock in 2008, when he said "This is what I want, all young guys around me. Sorry Eagle," "He's too old," "I like young guys," "You're just old, Eagle," "Eagle is too old," "old f**k"; 2) that Loper, Lehman, Arias, and Mike Mitchell were not fired even though they were younger and less productive than Plaintiff; and 3) Plaintiff's consistently higher gross sales numbers than younger salespeople in the thirteen months leading up to his termination. The Court finds this is enough circumstantial evidence to give rise to an inference of age discrimination and establish the requisite *prima facie* case.

### 2.    Defendant's Legitimate, Non-discriminatory Reasons

"Once a *prima facie* case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Wallis*, 26 F.3d at 889 (citing *Burdine*, 450 U.S. at 254). Defendant must "offer a legitimate, nondiscriminatory reason for [Plaintiff's] termination." *Id*. at 892. Defendant explains that Plaintiff was fired because he was not satisfactorily performing his job and because his position at the Dealership was unnecessary and eliminated. (Doc. 64 at 7-9).

Defendant argues that whether or not Plaintiff was performing his job satisfactorily was reflected by the Dealership's "terrible" sales performance shown by its consistently low CSI scores. (Doc. 64 at 4-5, 8-9). It is undisputed that CSI scores are a vital metric for judging the performance of a car dealership because these scores measure the customer satisfaction of the dealership. CSI scores are important to Toyota because it helps Toyota identify dealerships that need specific areas of improvement. Low CSI scores could result in the termination or nonrenewal of the Dealer Agreement with Toyota.

To establish his *prima facie* case, Plaintiff argued that even though the dealership's CSI scores were low, CSI scores are determined for both the Dealership's sales and service and he had nothing to do with the dealership's service department. (Doc. 75 at 9). However, Defendant does not argue that Plaintiff had an effect on the Dealership's CSI scores for service. It is undisputed that "the Dealership was in the bottom 10% of the Denver Region and of the nation in CSI scores for <u>sales</u> from 2004 through 2008." (Doc. 65 at 3 ¶ 1.10) (emphasis in original); *cf*. (Doc. 74 at 2 ¶ 10) ("Mr. Eagle admits paragraph 1.10 of Defendant's <u>Statement of Facts</u>"). The dealership's low CSI score for sales does not account for service. Indeed, the next fact in Defendant's statement of facts, which Plaintiff also admits, distinguishes between the dealership's CSI score in sales and CSI score based on service. *See* (Doc. 65 at 4 ¶ 1.11) ("The Dealership was in the bottom 10% of the Denver Regions and of the nation in CSI scores for <u>service</u>

from 2005 through 2010" (emphasis in original)).   Thus, Defendant's argument that Plaintiff was terminated because of the Dealership's low CSI scores for sales is a legitimate explanation.

In establishing his *prima facie* case, Plaintiff also argued that he was not a supervisor in the Dealership's sales department and, therefore, the overall sales numbers of the Dealership were not a reflection of his job performance.  (Doc. 75 at 9).  However, Plaintiff admits that he managed the Dealership's advertising, put together the Dealership's promotions, conducted the Dealership's off-site sales, helped conduct Dealership sales meetings, helped train the Dealership's sales force, and was one of the Dealership's designated "closers" whom salespeople would bring difficult customers to in order to close the deal.   (*Id.* at 2).   Accordingly, the undisputed facts show that Plaintiff's role in the sales department had at the very least an effect, if not a significant impact on the Dealership's sales performance.  Accordingly, the Court finds Defendant's explanation that the Dealership's performance was a reflection of Plaintiff's performance is legitimate.

Defendant explains that the facts show Plaintiff was fired for his performance and there is no evidence of discriminatory intent.  Undisputed evidence shows that Santa Maria was hired by Hancock and Toyota at the end of January 2009 and told that he was hired to improve the Dealership's consistently low CSI scores.  Santa Maria began making changes to personnel in February 2009.  On March 2nd, Santa Maria started making changes to the sales force.  Santa Maria fired Plaintiff and Plaintiff's direct supervisor, the General Sales Manager Snow.  Plaintiff was almost exclusively in charge of lease deals and he was solely in charge of advertising.  Plaintiff and Snow were in charge of training the sales staff.  Snow was in his early thirties when he was terminated. Santa Maria also terminated the employment of three other employees in the service department at the dealership in 2009.  The three terminated employees in the service department were less than thirty years old when they were fired.

Undisputed evidence that also supports the legitimacy of Defendant's employment

decisions is shown by the fact that after Plaintiff and Snow were terminated the Dealership's CSI scores dramatically improved.  After Plaintiff and Snow's termination, by the end of 2009, the Dealership's CSI scores for sales were out of the bottom 10% in the region and in the nation; and the scores continued to improve throughout 2010 and 2011.  By 2010, the Dealership's CSI scores for service were also out of the bottom 10% in the region and in the nation.  In 2012, the Dealership was awarded the prestigious President's Award by Toyota in recognition of the Dealership's improvement in its CSI scores and excellent performance in all facets of its operations.  Santa Maria accepted the award for the Dealership from Toyota.

Defendant also asserts that Plaintiff's unsatisfactory job performance was evinced by Plaintiff's practice of using of high pressure sales tactics which also led to the low CSI scores of the Dealership.  (Doc. 64 at 8).  Defendant contends that in order for Santa Maria to change the culture and practices used at the Dealership to in turn raise the Dealership's CSI scores that Santa Maria had to change the personnel at the Dealership with the most impact on the sales force.  The personnel at the Dealership with the most impact on the sales force were Plaintiff and Snow, both of whom Santa Maria fired.

The second reason Defendant articulates for firing Plaintiff is that Plaintiff's position at the Dealership was unnecessary.  (*Id*. at 7).  Defendant explains that Santa Maria determined that employing a dedicated "Preferred Finance Director/Leasing Manager" was unnecessary.  Undisputed facts show that it was rare for a dealership to employee a "Preferred Finance Director."  It was a position that Plaintiff titled and created on his own with the approval of the Dealership.  Leading up to Plaintiff's termination, leasing declined as a result of the financial crisis across the nation in 2008. In 2008 and 2009 the number of banks willing to finance car purchases and leases also declined.  Plaintiff was not the only employee at the Dealership capable of handling leases should the need arise.  Thus, eliminating Plaintiff's position would not significantly diminish the Dealership's ability to handle leases so it cannot be said that terminating Plaintiff would have negatively impacted the Dealership.  Therefore, this was

also a legitimate reason articulated by Defendant.  Accordingly, while Plaintiff had duties involving sales in addition to his duties as "Preferred Finance Director/Leasing Manager," the Court finds Defendant has articulated legitimate and non-discriminatory reasons for terminating Plaintiff's employment as both a salesman and as the "Preferred Finance Director/Leasing Manager."

### 3.    Plaintiff's Proof of Pretext

Because Defendant has offered legitimate, nondiscriminatory reasons for Plaintiff's termination, it has carried its burden of production, "and the presumptions created by the *prima facie* case[ ] disappear."  *Wallis*, 26 F.3d at 892 (citation omitted). "This is true even though there has been no assessment of the credibility of [Defendant] at this stage."  *Id*. (citing *Burdine*, 450 U.S. at 254).

"The presumptions having dropped out of the picture, we are left with the ultimate question of whether [Plaintiff] has offered evidence sufficient to permit a rational trier of fact to find that [Defendant] intentionally discriminated against him because of his age . . ."  *Id*.

> [I]n deciding whether an issue of fact has been created about the credibility of the employer's nondiscriminatory reasons, the district court must look at the evidence supporting the *prima facie* case, as well as the other evidence offered by the plaintiff to rebut the employer's offered reasons.  And, in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination under *McDonnell Douglas*, plaintiff has failed to raise a triable issue of fact.

> Thus, the mere existence of a *prima facie* case, based on the minimum evidence necessary to raise a *McDonnell Douglas* presumption, does not preclude summary judgment. Indeed, in *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991), we specifically held "a plaintiff cannot defeat summary judgment simply by making out a prima facie case." "[The plaintiff] must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).  In response to the defendant's offer of

1
2
3
4

> nondiscriminatory reasons, the plaintiff must produce "specific, substantial evidence of pretext." *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).  In other words, the plaintiff "must tender a genuine issue of material fact as to pretext in order to avoid summary judgment." *Id*.

5   *Wallis*, 26 F.3d at 890; *see also Coleman*, 232 F.3d at 1282 ("In response to [defendant's]

6   offer of nondiscriminatory reasons, [plaintiff] must produce specific, substantial evidence

7   of pretext.") (citations omitted)).

8          While the Court recognizes that the Ninth Circuit "require[s] very little evidence

9   to survive summary judgment in a discrimination case," *Lam v. Univ. of Hawai'i*, 40 F.3d

10  1551, 1564 (9th Cir. 1994), the Court still finds that Plaintiff has not offered "specific

11  [and] substantial evidence of pretext," *Wallis*, 26 F.3d at 890.  Plaintiff's argument that

12  Defendant's explanation is pretext is premised on two theories: 1) that Hancock still ran

13  the Dealership in spite of the fact that Santa Maria was the GM and that Hancock

14  discriminated against Plaintiff because of his age; and 2) that Santa Maria himself

15  discriminated against Plaintiff because of his age.  Plaintiff essentially argues that the

16  evidence supporting these theories shows that the discharge occurred under

17  circumstances giving rise to an inference of age discrimination.  (Doc. 75 at 14).

18                      **a.      No Evidence Shows Hancock ran the Dealership**

19         Plaintiff's initial argument is that Hancock ran the Dealership and Hancock's

20  pervasive use of discriminatory comments shows Defendant's legitimate explanation is

21  merely pretext.  (*Id*. at 14).  It is undisputed that Hancock made five discriminatory

22  statements that included: "This is what I want, all young guys around me.  Sorry Eagle,"

23  "He's too old," "I like young guys," "You're just old, Eagle," "Eagle is too old," "old

24  f**k".  Plaintiff's pending claim is discrimination though and not hostile work

25  environment.  To show discrimination, Plaintiff must show that the remarks were tied to

26  his termination either directly or indirectly.  *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705

27  (9th Cir. 1993).

28         The only evidence Plaintiff has offered of Hancock's supervisory role at the

Dealership is 1) that Hancock hired Santa Maria, and 2) that Plaintiff overheard Hancock angrily talk about Santa Maria.

Plaintiff claims that he personally witnessed Hancock continue to participate in the day-to-day operation of the Dealership after Santa Maria was hired, including supervising Plaintiff.  (Doc. 75 at 5).  However, Plaintiff has offered only one fact to support this claim.  In answer to the question "[d]id you ever hear Ryan Hancock exercising supervisory authority over Bob Santamaria [sic]?"  Plaintiff explained that Hancock was angry at one point with Santa Maria because Santa Maria was allegedly trying to run the Ford store.  Hancock then said to an unidentified party, "I don't give a s**t what [Santa Maria] said.  I'll run the store.  I'll show [Santa Maria] who runs the store."  (Doc. 74-1 at 39).  In an attempt to clarify, the questioner asked Plaintiff "[w]hat store" Plaintiff thought that Hancock was referring to and Plaintiff answered, "[t]he whole thing.  He was just in general."  (*Id.*).

However, undisputed evidence shows that Toyota requires that the GM of the Dealership meet certain qualifications and that Toyota specifically rejected Hancock for the GM position in December 2007 because of the Dealership's low CSI scores.  In January 2008, Toyota informed Alexander that should he ever not be able to perform the duties of GM that Toyota could force the appointment of an individual with proven, successful, and relevant experience to assume the position of GM.  In January 2008, Hancock was required to sign an "Investor Only" letter for Toyota that confirmed Hancock would not serve as the GM of the Dealership and that Hancock could not run the Dealership on a day-to-day basis.  After Alexander died in October 2008, Hancock was again reminded by Toyota that he could not serve as the GM of the Dealership and Hancock was told that any candidate for GM would need to be evaluated by Toyota.  Toyota requires that approved GMs be given full operational responsibility of the Toyota dealership they operate.

In January 2009, Hancock hired Santa Maria as the GM.  Toyota evaluated and approved Santa Maria as the GM.  Santa Maria was told by Hancock and Toyota that he

was hired to improve the consistently low CSI scores of the Dealership.  Hancock and Toyota also told Santa Maria that he would have complete authority over the day-to-day operation of the Dealership, including personnel decisions.  Toyota further stressed to Santa Maria that he was in charge of the Dealership and that Hancock was only the Investor.  Pursuant to the agreement with Toyota, Santa Maria had full operational control of the Dealership, including all authority for all personnel decisions.  In February and March 2009, when Santa Maria began making personnel changes to sales staff and fired Plaintiff, he also terminated Snow, the significantly younger General Sales Manager.

Given this evidence, the Court finds that Plaintiff has not offered specific and substantial evidence of pretext.  Plaintiff has not shown that Hancock was tied either directly or indirectly to his termination.  Plaintiff's evidence that Hancock ran the Dealership is based on an unreasonable inference because it is only supported by the lone conversation Plaintiff overheard that referred to the Ford store, an entirely separate dealership from the one at issue in this case.  Even when given the chance to clarify "which store," Plaintiff's answer is still vague and is no more than Plaintiff's third hand interpretation of a conversation between two other people.  This is neither specific nor substantial evidence, especially when compared to specific evidence showing that Santa Maria was not beholden to do Hancock's bidding and that Toyota took great lengths to ensure Hancock would have no supervisory authority at the Dealership.

Plaintiff disputes a number of material facts with the mere assertion that "after Robert Santa Maria became the General Manager of the Dealership on January 28, 2009, as the owner of the Dealership, Ryan Hancock continued to work at the Dealership and exercise supervisory authority over the Dealership's employees, including Mr. Eagle" citing Plaintiff's deposition (Exhibit A) and declaration (Exhibit B).  (Doc. 74 at 4-26). However, these "statements of fact" by Plaintiff are not facts and are only supported by Plaintiff's conclusory statements throughout his deposition and declaration and the conversation Plaintiff overheard.

The Court finds no reasonable juror could find that Hancock ran the Dealership and forced Santa Maria to make personnel decisions based on the sparse evidence Plaintiff has offered at this point.  Accordingly, Plaintiff has not tendered a genuine issue of material fact over whether or not Hancock actually ran the Dealership.

### b.  No Evidence Shows Santa Maria Engaged in Discrimination

With regard to evidence of Santa Maria's discrimination, Plaintiff has also failed to produce specific and substantial evidence.  The only evidence of Santa Maria's discrimination that Plaintiff offers is 1) that Santa Maria allegedly failed to stop discriminatory comments by other employees and would just laugh when these comments were made; 2) that Santa Maria made a discriminatory comment when he said he was "surprised" that Plaintiff could "get out of bed"; and 3) that Santa Maria gave evolving reasons for why the Dealership terminated Plaintiff.

Plaintiff alleges that Santa Maria would just laugh when employees would make discriminatory remarks regarding Plaintiff's age and that by laughing Santa Maria unlawfully ratified the harassment.  (Doc. 75 at 15).  However, turning to Plaintiff's deposition where he makes this allegation, Plaintiff states that Santa Maria was present in the room three to five times when other employees made discriminatory comments about Plaintiff's age.  (Doc. 74-1 at 21).  Yet, when asked to explain, Plaintiff could only recall a single instance where another employee made a comment.  Plaintiff recalled, "[o]ut in the service island, [when Santa Maria] was walking out.  [Santa Maria] didn't say anything, but he left.  I want to say it was probably a couple of salesman.  They were commenting on—something was said.  We got Eagle.  He's the only guy.  Santamaria [sic] looked at me and laughed."  (*Id*.).

The Court finds that this evidence is not specific enough to show pretext.  While Plaintiff claims three to five instances, he could only vaguely remember one instance where Santa Maria was present when other employees were talking about Plaintiff.  The sole instance Plaintiff cites does not reference Plaintiff's age.  The comment by the

unidentified employees is not even vaguely directed at a protected class and could have been in reference to any number of things. The Court finds that there is no evidence that Santa Maria failed to stop discriminatory comments by others nor is there evidence that Santa Maria actively encouraged discriminatory comments by laughing at them.

Plaintiff also claims that Santa Maria made a discriminatory comment on one occasion. (Doc. 75 at 15). Plaintiff recalls, "There was something in a sales meeting when somebody walking in late. I said, 'If I can be here, you can be here' or something like that. And Santamaria [sic] said something that was a comment like that. I can't remember what he said. 'Surprised you can make it out of bed,' or something. Some comment. I don't recall." (Doc. 74-1 at 22).

The Court also finds that this evidence is not specific enough to show pretext. Plaintiff clearly stated at numerous points in this statement that he could neither remember nor recall what Santa Maria said. When Plaintiff tried to paraphrase what he thought Santa Maria said, the only statement Plaintiff offers has no clear or even off handed reference to age. There is no evidence that Santa Maria's comment, "surprised you could make it out of bed" is directed at a protected class. It was directed at Plaintiff as an individual and could have meant anything.

Finally, Plaintiff argues that pretext is proven because Santa Maria offered evolving reasons for his termination to the EEOC. (Doc. 75 at 13-14). Plaintiff also argues that pretext is shown because Santa Maria's articulated reasons to the EEOC are not the same as the reasons articulated to the Court as they did not include Plaintiff's performance and the Dealership's low CSI scores, Plaintiff's high pressure sales tactics, Plaintiff's alleged inability to get along with his coworkers, Plaintiff's alleged treatment of customers, or the allegation that Plaintiff was overpaid. (*Id.* at 7, 14).

On August 25, 2009, the dealership submitted a letter to the EEOC signed by Santa Maria stating that Plaintiff was terminated because of the "elimination of the Preferred Finance Department." On October 29, 2009, Santa Maria signed another letter sent to the EEOC stating that Plaintiff was terminated because Santa Maria had decided

to eliminate "the position of Leasing Director."  (*Id*. at 14).

Plaintiff argues that the Dealership had no Preferred Finance Department, only a Preferred Finance Director, therefore Santa Maria's explanation on October 29th is evidence of pretext.  However, Plaintiff's argument is essentially a distinction without a difference.  The undisputed facts show that Plaintiff created and coined the position of Preferred Finance Director, that it was uncommon for dealerships to have a Preferred Finance Director, that Plaintiff's role was informal in that position, and that Plaintiff functioned as the Preferred Finance Director/Leasing Director and these terms were interchangeable.  Given these facts the Court finds Santa Maria's explanations to the EEOC in his letters did not conflict, that any differences between them were *de minimis*, and that they are not evidence of pretext.

The additional reasons Defendant articulated to the Court for firing Plaintiff are also not proof of pretext.  As explained, Defendant told the EEOC that Plaintiff was fired because his position was eliminated, however, in articulating non-discriminatory reasons for firing Plaintiff to the Court, Defendant argued that 1) Plaintiff's position was eliminated, and 2) that Plaintiff's performance contributed to the Dealership's low CSI scores.  (Doc. 64 at 7).  Plaintiff raises the question of whether additional, but compatible reasons articulated to the Court by a defendant employer during litigation, that were not articulated to the EEOC by a defendant when initially asked why a claimant was fired, is evidence in itself of pretext.

Courts have consistently held that this is not evidence of pretext.  The Ninth Circuit Court of Appeals has stated that "[s]imply because an explanation comes after the beginning of litigation does not make it inherently incredible."  *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) (citing *Merrick v. Farmers Ins. Grp*., 892 F.2d 1434, 1438 (9th Cir. 1990)).  In *Johnson v. Nordstrom, Inc*., the defendant employer gave one reason for its decision not to promote the plaintiff to the EEOC and later gave additional reasons.  260 F.3d 727, 730-31 (7th Cir. 2001).  The plaintiff claimed that the defendant employer's changing reasons for not promoting her were evidence of pretext.  *Id*. at 733.

Seventh Circuit Court of Appeals found that the plaintiff had not shown pretext merely because the defendant "supplemented its explanations in the context of EEOC charges and litigation." *Id*. The Court of Appeals explained that "there has been no retraction of any of [defendant's] reasons for failing to promote [plaintiff] nor are any of [defendant's] reasons inconsistent or conflicting. Thus, [plaintiff] has failed to demonstrate that [defendant's] legitimate, nondiscriminatory reasons for failing to promote her to beauty director were pretextual." *Id*. at 733-34; *see also Nidds v. Schindler Elevator Corp*., 113 F.3d 912, 918 (9th Cir. 1997) (holding, in context of retaliation, that the presence of "shifting" or different justifications for an adverse action is not sufficient to defeat summary judgment when those justifications "are not incompatible").

Similar to *Johnson*, in this case Defendant has not given incompatible nor even shifting reasons for its conduct. Defendant has merely supplemented its explanations in the context of EEOC charges and litigation. In addition, Plaintiff's use of high pressure sales tactics is not a separate reason for firing Plaintiff; it is merely a part of Defendant's argument regarding Plaintiff's performance and Plaintiff's effect on the Dealership's low CSI scores. *See* (Doc. 64 at 8). Further, nowhere in Defendant's motion for summary judgment or in its reply does Defendant argue that Plaintiff was fired due to Plaintiff's inability to get along with his coworkers, Plaintiff's treatment of customers, or the allegation that Plaintiff was overpaid. These factual allegations appear in Defendant's statement of facts only. (Doc. 65 at 12 ¶ 6.20, 11 ¶¶ 6.8, 6.9, 6.10). Even if Defendant had articulated these as additional non-discriminatory reasons for terminating Plaintiff, as discussed above, this would not be evidence in and of itself of pretext as none of these reasons are incompatible with the reasons given.

Considered individually, Plaintiff has failed to offer specific evidence of pretext and taken together Plaintiff has also failed to offer substantial evidence of pretext that shows Defendant's reasons for terminating Plaintiff were discriminatory. The Court is required to construe all *disputed* facts in the light most favorable to the non-moving party. *Ellison*, 357 F.3d at 1075. However, Plaintiff has only offered disputing

conclusions and he has not offered disputing facts.  All of the evidence that Plaintiff has offered is merely colorable and is not significantly probative.  Accordingly, The Court finds no reasonable juror could find based on the evidence presented that the Dealership, through Santa Maria's actions, unlawfully discriminated against Plaintiff because of his age.

## III.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendant's Motion to Strike (Doc. 81) is denied.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 64) is granted.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiff, with Plaintiff to take nothing.

**IT IS FINALLY ORDERED** that the Clerk of the Court shall close this case.

Dated this 17th day of September, 2013.

James A. Teilborg
Senior United States District Judge